UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WESTERN WATERPROOFING COMPANY, INC. D/B/A WESTERN SPECIALTY CONTRACTORS<br><br>Plaintiff,<br><br>vs.<br><br>ZURICH AMERICAN INSURANCE COMPANY, ALLIED WORLD SPECIALTY INSURANCE COMPANY, AND ALLIED WORLD ASSURANCE COMPANY (U.S.) INC.,<br><br>Defendants. | Civil Action No.: 1:20-cv-3199<br><br>**COMPLAINT FOR BREACH OF CONTRACT, DECLARATORY RELIEF, AND DEMAND FOR JURY TRIAL** |

Plaintiff, WESTERN WATERPROOFING COMPANY, INC. D/B/A WESTERN SPECIALTY CONTRACTORS ("Western") by and through its attorneys, Saxe, Doernberger & Vita, P.C., hereby complains and alleges as follows against Defendants, ZURICH AMERICAN INSURANCE COMPANY ("Zurich"), ALLIED WORLD SPECIALTY INSURANCE COMPANY ("Allied Specialty"), and ALLIED WORLD ASSURANCE COMPANY (U.S.) INC. ("AWAC"):

## PARTIES

1.      At all times hereinafter mentioned, Western was and is a corporation organized and existing under the laws of the State of Missouri, with its principal place of business at 1637 Warson Rd., St. Louis, Missouri 63132.

2.      Western is informed and believes and thereon alleges that, at all relevant times herein, Zurich was and is an entity formed and existing under the laws of the State of Illinois, with its principal place of business at 1299 Zurich Way, Schaumburg, Illinois 60196.

3.      Western is informed and believes and thereon alleges that, at all relevant times herein, Allied Specialty was and is an entity formed and existing under the laws of the State of Delaware, with its principal place of business at 199 Water Street, 24th Floor, New York, New York 10038.

4.      Western is informed and believes and thereon alleges that, at all relevant times herein, AWAC was and is an entity formed and existing under the laws of the State of Delaware, with its principal place of business at 199 Water Street, 24th Floor, New York, New York 10038.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. This action is between citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Jurisdiction and venue are proper in the Southern District of New York pursuant to 28 U.S.C. § 1391, et seq., as the relevant events occurred in New York City. Two of the three insurance policies were issued to first named insureds domiciled in New York. Those insurance policies insure property, losses and damages arising out of liabilities at a specified construction project located in New York City. The third policy was issued to Western in Missouri and covers claims arising out of its operations nationwide. An accident occurred at the construction project in New York City, resulting in alleged losses and liabilities for which Western seeks insurance coverage.

## FACTUAL ALLEGATIONS

### The Project

7.     BDG Gotham Residential, LLC ("Gotham") is the Owner of a parcel of land located at 158 East 126th Street, with legal address of 149 East 125th Street (the "Premises"). Gotham, as Owner, entered into an agreement in writing with ZDG, LLC ("ZDG"), as construction manager ("CM"), dated on or about September 1, 2016 (the "CM Agreement") for the construction of an eleven-story mixed use building located at the Premises known as the Gotham Plaza Project ("the Project").

8.     ZDG, as CM, and Western (dba Western Specialty Contractors), as Subcontractor, entered into a written subcontract dated as of April 7, 2017 (the "Subcontract") which provided for Western to install the curtain wall - façade at the Project. A true and accurate copy of the main contract, with Changes dated April 27, 2017 and Exhibit A thereto, Scope of Work, is attached hereto as Exhibit A.

9.     The Subcontract provided that Western was required: "to perform and furnish all of the work, labor, services, materials, plans, equipment, tools, scaffolds, appliances, coordination, […],[1] and all other things necessary for the completion for the Work for the Project," as more particularly described in the Scope of Work, Exhibit A.  (*Id.* at Section 2.1.) The Subcontract further required that Western "furnish all labor, materials, equipment, and services, including, but not limited to, competent supervision, shop drawings, samples, tools, and scaffolding as are necessary for the proper performance

---

[1] The terms "engineering, design" are deleted by Changes to Subcontractor Agreement, dated April 27, 2017.

of the Work." (*Id.* at Section 25.4.) These contractual requirements placed Western in a construction/project management position over Western's Work under the Subcontract.

**The Insurance Policies**

***The Zurich CCIP GL Policy***

10.     ZDG implemented a Contractor Controlled Insurance Program ("CCIP"), providing Workers' Compensation, Employers' Liability, General Liability and Excess Liability coverages to contractors of every tier that provided direct labor to the Project. USI Insurance Services, LLC ("USI") administered the CCIP.  A true and accurate copy of the CCIP Manual for the Project is attached hereto as Exhibit B.

11.     As part of the CCIP, ZDG procured a General Liability ("GL") policy from Zurich, bearing Policy No. GLO 0217324-00, with a policy period of November 16, 2015 – November 16, 2019 (the "Zurich Policy").  A true and accurate copy of the Zurich Policy is attached hereto as Exhibit C.

12.     Pursuant to a Schedule of Named Insureds in the Zurich Policy, "all contractors of any tier to whom ZDG contracts to furnish insurance under the [CCIP], enroll in the program and who perform operations at a Designated Project Site" are Named Insureds.  (See Exhibit C at p. 11)  The Gotham Plaza Project is identified in Endorsement No. 22 to the Zurich Policy as the "Designated Project." *Id.* at p. 11.

13.     On August 22, 2017, USI sent an email to Western, confirming that Western was enrolled in the CCIP, and issued a Certificate of Insurance to Western as an insured under the CCIP policies, including the Zurich Policy.  A true and accurate copy of this email is attached hereto as Exhibit D.

14.     In the Insuring Agreement under Coverage A – BODILY INJURY AND PROPERTY DAMAGE LIABILITY, Zurich agreed as follows:

a. [Zurich]  will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result. […]

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

(2) The "bodily injury" or "property damage" occurs during the policy period;

and

[. . .]

15.     For Coverage A, the Zurich Policy has a $2,000,000 Per Occurrence limit of liability and a $4,000,000 Aggregate limit of liability, excess a $500,000 Each Occurrence Deductible.

### ***Allied Specialty Builders' Risk Policy***

16.     The CCIP Manual provides, in relevant part:

"Owner [Gotham] shall procure and maintain throughout the performance of the Work, Builder's Risk "All Risk" property insurance, insuring against physical loss or damages to the Work in an amount equal to 100% of the insurable value of the Work and shall include as additional insureds Construction Manager [ZDG] and/or Contractors of every tier, as their respective interests may appear.

(Exh. A, ¶ A.7., p. 14)

17.     Gotham procured Builders' Risk coverage for the Project from Allied Specialty, contained in a Commercial Inland Marine policy bearing Policy No. 0310-3126, with an effective date of  September 6, 2016 – December 6, 2018 (the "Allied Specialty Policy" or the "BR Policy").   A true and accurate copy of the Builders' Risk Policy is attached hereto as Exhibit E.

18.     The Schedule of Coverage, Builders' Risk Comprehensive Form ("BR Schedule"), shows the Premises' location as the "Scheduled Jobsite" with a Limit of $120,023,696, excess a $25,000 Deductible. The BR Schedule sets out Sublimits for various Coverage Extensions and Supplemental Coverages.

19.     The Named Insured Endorsement states, "To the extent required for the insured project, and only as their respective interest appear, all owners, contractors, and subcontractors of every tier […] are recognized as named insureds hereunder."

20.     In the Builders' Risk Coverage, Scheduled Jobsite Form Comprehensive Form "BR Coverage"), Allied Specialty agreed as follows:

"We" cover the following property unless the property is excluded or subject to limitations:

**Course of Construction –**

1.  **Coverage –** "We cover direct physical loss or damage caused by a covered peril to "buildings or structures" while in the course of construction, erection, or fabrication.

2.  **Scaffoldings, Fencing, And Temporary Structures** – "We" also cover direct physical loss or damage caused by a covered peril to:

    a.  Scaffolding, construction forms, or temporary fencing; and

    b.  Temporary structures.

(Exh. E at p. 58)

21.     The BR Coverage defined "buildings or structures" as:

    a.  Buildings;

    b.  Structures;

    c.  Materials and supplies that will become a permanent part of the buildings or the structures; and

    d.  Foundations, excavations, grading, filling, attachments, permanent fencing, and other permanent fixtures.

(Exh. E at p. 76)

22.     As required of Gotham (per the CCIP Manual), the Allied Specialty policy Gotham obtained provides "All Risk" coverage.  In the BR Coverage, "Perils Covered," Allied Specialty agreed: "'We' cover risks of direct physical loss or damage unless the loss is limited or caused by a peril that is excluded."

23.     The Allied Specialty Policy contains "Delay in Completion Coverage Part, Includes Rental Income and Income Coverage," wherein Allied Specialty agreed, under "Coverages" to provide coverage for "Additional Construction Expenses" and "Additional Soft Costs" incurred during a "delay period." The Limits for these coverages, per the Delay in Completion Schedule – Includes Rental Income and Income Coverages, are $18,869,232.

24.     The Allied Specialty Policy also provides "Supplemental Coverages Amendatory – Expediting Expenses and Extra Expenses" with a limit of $500,000. Both of these supplemental coverages apply when there is a delay in completion of the project caused by a covered peril.

### *The AWAC Professional Liability Policy*

25.     To protect itself from claims arising out of its operations nationwide, Western Holding Group, Inc. procured a Contractor's Professional and Pollution Liability Policy ("PL") from AWAC, bearing Policy No. 0307-8557, with an effective date of October 1, 2018 – October 1, 2019 (the "AWAC Policy" or the "AWAC PL Policy").  A true and accurate copy of the AWAC Policy is attached hereto as Exhibit F.

26.     Western Waterproofing Company, Inc. dba Western Specialty Contractors, is a scheduled Additional Named Insured under the AWAC Policy, with a Retroactive Date of October 1, 2015.

27.     AWAC is an insurance carrier and, amongst other things, is engaged in the business of providing professional liability insurance policies to subcontractors, including Western.

28.     Under Section I of the AWAC Policy, Insuring Agreement 1.a. - Contractor Professional Liability, AWAC agreed as follows:

> [AWAC] will pay those sums that the Insured becomes legally obligated to pay as professional damages because of a claim resulting from an actual or alleged act, error or omission in professional services, provided:
>
> > (1) The claim arises out professional services rendered on or after the professional liability retroactive date and prior to the expiration of the policy period; and
> >
> > (2) The claim is first made against the Insured and first reported to [AWAC] in writing, during the policy period [. . . ].

29.     Insuring Agreement 1.a. has a $5,000,000 limit of liability for each Act, Error or Omission and in the Aggregate, subject to a Retention of $250,000 for each Act, Error or Omission.

30.     Under Section II, the AWAC Policy also imposes on AWAC a duty to defend any claim made against any Insured seeking sums payable under the policy.

31.     The AWAC Policy defines the following pertinent terms as follows:

a.     "Professional damages" include, but are not limited to, monetary judgment, awards or settlement of compensatory damages and related "claim expense."

b.     "Professional services" means "Value Engineering and field changes to design; construction/project management, design, asbestos, lead or mold abatement, and or environmental remediation services, when part of a construction/project management and or a design build contract and in support of Your Work."

c.     "Claim" is defined as a "demand, notice or assertion of a legal right seeking a remedy or alleging liability or responsibility on the part of the insured."

d.     "Claim expenses" includes costs incurred in the investigation and defense of a "claim" or suit.

## The Accident

32.     On June 25, 2018, Western was working on the Project, performing its work under the Subcontract, when an accident occurred.  As set forth in more detail below, Western, Gotham and ZDG reported the accident to various, insurers, including the insurers for the Zurich GL Policy, the Allied Specialty BR Policy and the AWAC PL Policy.

33.     Allied Specialty investigated the site on January 15, 2019.  Allied Specialty's investigation showed that, at the time of the accident, Western was using a Jekko MPK20

Minipicker (the "Jekko") to lift one of Project's unique façade panels into place. Allied Specialty's October 1, 2019 letter to Western states:

> [The Jekko] "was subjected to a gravity related force such that it was propelled off of the Project building ("the Accident").  As a result of the Accident, the [Jekko]  also dropped one of the Project's unique façade panels, which suffered extensive damage." Based on our January 15, 2019 inspection at the loss location, we also were advised that, when the [Jekko] fell out of the fourth story window, an exterior panel on the second floor also sustained damage. We also understand, based on our inspection, that the damaged panel has now been replaced, and that there were no other damages sustained to the building.

A true and accurate copy of this letter is attached hereto as Exhibit G.

### The Gotham/ZDG Lawsuit

34.     On or about June 4, 2019, Gotham and ZDG filed suit against Western in a suit styled *BDG Gotham Residential, LLC, and ZDG, LLC v. Western Waterproofing Company, Inc. d/b/a Western Specialty Contractors and Western Surety Company,* in the Supreme Court of the State of New York, County of New York. The case was removed to federal court and is Civil Action No. 1:19-cv-06386 (AJN) in the United States District Court for the Southern District of New York (the "Gotham/ZDG Lawsuit"). Gotham and ZDG filed an Amended Complaint dated September 19, 2019 (the "Complaint").  A true and accurate copy of the Complaint is attached hereto as Exhibit H.

35.     The Complaint alleges that at the time of the June 25, 2018 accident, Western was using a Jekko mini crane on the fourth floor of the Project to lift one of the panels of the façade, while workers were positioned below on the second floor - to guide the bottom of the panels into place - and on the third floor - to "marry" the top of the panels. (*Id.* at ¶36).

36.    The Complaint alleges that at the time of the accident, Western used an uncertified crane operator (*id.* at ¶31), failed to tie off  the Jekko mini crane (*id.* at ¶34), and then overloaded the unsecured mini crane (i*d.* at ¶37).

37.    The Complaint alleges:

At first, as the Jekko mini crane lifted a glass and metal panel up from its flat position on the second floor, the second floor workers carried part of the panel's weight, guiding it up. When the panel was vertical, the workers gave it a push so that it cleared the concrete deck, putting all the panel weight on the Jekko mini crane. Overloaded and unsecured, the Jekko mini crane fell forward, and the boom reached in to the third floor, grabbing ironworker Christopher Jackson and flinging him to the ground. The boom also hit ironworker Jorge Delgado in the back, pushing him further into the building. Had the mini crane been tied off as required, it would not have fallen over. First responders transported both injured workers to
Harlem Hospital for treatment. Mr. Jackson suffered severe trauma to his head which affected his ability to speak and to walk. Mr. Delgado was struck in the back, and suffered severe spinal injuries impairing his ability to walk and move.

(*Id.* at ¶37).

38.    In addition to the bodily injuries to ironworkers Jackson and Delgado[2] the Complaint alleges that Western caused property damage and loss of use of the Premises to Gotham and ZDG: "The accident not only caused personal injuries but also damaged panels and surrounding property and resulted in the loss of use of the Premises and the Project resulting from, *inter alia*, the personal injuries and property damage." (*Id.* at ¶38).

39.    In addition, the Complaint alleges that the accident caused the New York City Department of Buildings ("DOB") to issue stop work orders which effectively stopped

---

[2] Jackson and Delgado have each sued Western in separate lawsuits, each alleging bodily injuries as a result of Western's alleged negligence.  Zurich's sister company, American Zurich Insurance Company ("AZIC"), issued the Workers Compensation and Employers Liability ("WC/EL") policy under the CCIP.  AZIC, unlike Zurich here, has assumed its duty to defend Western in those personal injury suits.

all work on the Project.  (*Id.* at ¶39).

40.    The Complaint alleges that Western and its employees (for whom Western is liable), "through their negligent, grossly negligent, or reckless acts or omissions [caused] serious physical injury to Christopher Jackson and Jorge Delgado, physical damage to the Premises and the Project (including loss of use), and extensive costs overruns and delays." (*Id.* at ¶¶40-41).

41.    The Complaint alleges that these same actions by Western were breaches of the Subcontract, causing "serious physical injuries and physical damages to the Premises and Project (including loss of use), and extensive cost overruns and delays." (Id. at ¶41).

42.    As set forth in more detail below, the allegations of the Complaint trigger coverage under the Zurich GL Policy, the Allied Specialty BR Policy, and the AWAC PL Policy.

**Allegations triggering coverage under Zurich's GL Policy**

43.    The Complaint alleges that Western is legally liable to Gotham and ZDG for damages "because of" "bodily injury" and "property damage" arising out of an "occurrence."

44.    The Complaint alleges, "The accident not only caused personal injuries but also damaged panels and surrounding property and resulted in the loss of use of the Premises and the Project resulting from, *inter alia*, the personal injuries and property damage." (*Id.* at ¶ 38.)

45. The Complaint also alleges:

As a result of the above described events and the abrupt cataclysmic occurrences of June 25, 2018, and the resulting personal injuries and

property damage, the DOB issued several violations and stop work orders and *inter alia* ordered the cessation of all activities at the Premises involving lifting or hoisting, effectively stopping all work on the Project.

(*Id.* at ¶ 39.)

46.    The Complaint pleads causes of action for negligence and gross negligence. (See Exhibit H, Complaint, Second and Third Causes of Action). The allegations in each of these causes of action are that Western breached duties it owed to Gotham and ZDG resulting in the occurrence of June 25, 2018, for which these parties are seeking cost overrun and delay damages *because of* the alleged bodily injuries and property damage to the Project and the Premises, including loss of use thereof, in excess of $37,147,349.00. (*Id.* at ¶¶51-59, 60-68).

### Allegations triggering coverage under the Allied Specialty BR Policy

47.    The Complaint alleges "direct physical loss or damage as a result of a covered peril to 'buildings or structures' while in the course of construction, erection, or fabrication" at the Scheduled Jobsite (the Gotham Project at the Premises), within the BR Coverage of the Allied Specialty Policy.

48.    The Complaint alleges direct physical loss or damage to the panels and surrounding property (*id.* at ¶38) while in the course of construction at the Premises.

49.    In addition, Gotham and ZDG allege that they experienced extensive "cost overruns and delays" (*id.* at ¶40-41) and "costs due to delay and efforts to mitigate delay (*id.* at ¶42).  Upon information and belief, a liberal reading of these Complaint allegations indicates that Gotham and ZDG allege that they suffered one or more occurrences of "Additional Construction Expenses," "Additional Soft Costs," "Expediting Expenses" and/or "Extra Expenses," as those terms are defined in the Allied Specialty Policy.

*Allegations triggering the AWAC PL Policy*

50.     The Complaint/"claim" alleges that Western failed in its construction/project management duties to adequately supervise the use of the Jekko mini crane, follow all applicable safety rules and standards, and obtain the necessary permits and certifications, as required by the Subcontract.  (*Id.* at ¶65).

51.     The Complaint/"claim" alleges that Western failed to properly render the following construction/project management "professional services" in support of Western's Work under the Subcontract:

> Before using such a mini crane, the DOB required [Western]: 1) to engage a licensed engineer to assess the project and create design drawings showing how the mini crane was to be used, that it could support the intended load, and how and where it would be tied off to avoid a fall, and to submit these drawings to the DOB to obtain an Alteration Type 2 ("Alt 2") building permit; and 2) to ensure that the mini crane operator has successfully completed a DOB-approved machine manufacturer's training for the specific make and model of mini crane.

(*Id.* at ¶25).


## COUNT I

## BREACH OF CONTRACT AGAINST ZURICH

52.     Western hereby incorporates paragraphs 1 through 51, inclusive, as though fully set forth herein.

53.     Zurich, in consideration of premiums paid, duly executed and delivered to ZDG the Zurich CCIP GL Policy.

54.     Western, as a duly enrolled contractor performing operations at the Designated Project Site (the Gotham Plaza Project), is a Named Insured under the Zurich Policy.

55.    Western gave timely notice of the Gotham/ZDG Lawsuit under the Zurich Policy.

56.    Western is, and at all relevant times was, in compliance with all conditions precedent for coverage under the Zurich Policy.

57.    Zurich is obligated pursuant to the terms of the Zurich Policy to pay for all sums in that Western is legally obligated to pay as damages because of "bodily injury" or "property damage" caused by an "occurrence" during the policy period.

58.    Zurich also has a duty to defend Western in against any "suit" seeking those damages.

59.    The factual allegations of the Complaint together with the causes of action for negligence and gross negligence allege an "occurrence" during the policy period, resulting in damages because of "bodily injuries" to Jackson and Delgado. The Complaint alleges Gotham and ZDG suffered damages because of those bodily injuries, namely, loss of use of the Premises and the Project and extensive cost overruns and delays.

60.    The factual allegations of the Complaint together with the causes of action for negligence and gross negligence allege an "occurrence" during the policy period, resulting in damages because of "property damage" to the Premises and the Project, including loss of use the Premises and the Project and extensive cost overruns and delays.

61.    The Complaint allegations fall squarely within Coverage A of the Zurich policy, thereby triggering Zurich's duty to defend Western.

62.    On September 20, 2019, Western tendered the Gotham/ZDG Lawsuit to Zurich for defense and indemnity under the Zurich CCIP GL Policy. On September 27, 2019, by and through its attorneys, Western tendered the Amended Complaint to Zurich

and asked for Zurich to approve of Western's selection of defense counsel. The letter noted that bodily injury suits had been commenced against Western.

63.     Zurich responded to Western's tender by letter dated October 10, 2019 to Western's counsel, wherein Zurich communicated its position that there is no coverage for the Gotham/ZDG Lawsuit and denied any obligation to defend or indemnify Western under the Zurich Policy.

64.     On January 16, 2020, Western, by and through its attorneys, issued a rebuttal letter to Zurich further explaining its right to coverage, including a defense, of the Gotham/ZDG Lawsuit under the Zurich Policy and requesting that Zurich promptly reconsider its coverage disclaimer and acknowledge its duty to defend and indemnify Western.

65.     Zurich's attorneys responded on January 29, 2020, and Zurich again denied coverage.

66.     The allegations of the Complaint clearly allege a reasonable possibility for coverage for damages because of bodily injury and damages because of property damage caused by an occurrence, thereby triggering Zurich's duty to defend.

67.     Despite demands and clear allegations that trigger at least a potential for coverage, Zurich unreasonably refuses and/or otherwise fails to defend Western under the Zurich Policy terms, in breach of Zurich's contractual obligations under Coverage Part A.

68.     As a result of Zurich's refusal and/or failure to defend Western, in breach of its contractual obligations, Western has suffered damages and will continue to suffer damages in the future, all in a sum to be determined at the time of trial.

## COUNT II

## DECLARATORY JUDGMENT AS TO ZURICH POLICY

69.     Western hereby incorporates paragraphs 1 through 68, inclusive, as though fully set forth herein.

70.     A dispute has arisen between Western and Zurich regarding whether Zurich is obligated to defend Western.

71.     An actual case and a justiciable controversy exist regarding Zurich's obligations under the Zurich CCIP GL Policy with respect to whether Zurich has a duty to defend Western for the Gotham/ZDG Lawsuit.

72.     A declaratory judgment pursuant to 28 U.S.C. § 2201 is necessary and appropriate to determine the rights and duties of Western and Zurich pursuant to the Zurich Policy.

## COUNT III

## BREACH OF CONTRACT AGAINST ALLIED SPECIALTY

73.     Western hereby incorporates paragraphs 1 through 72, inclusive, as though fully set forth herein.

74.     Allied Specialty, in consideration of premiums paid, duly executed and delivered to Gotham the Allied Specialty BR Policy.

75.     On information and belief, on or about December 11, 2018, Gotham and/or ZDG tendered a claim to Allied Specialty for coverage under the BR Policy.

76.     On information and belief, the insurance claim by Gotham and ZDG under the BR Policy, at least in part, is for the same losses for which Gotham and ZDG now sue Western.

77.     On information and belief, as of the date of this Complaint, Allied Specialty has failed to adjust or pay the claim by Gotham and ZDG.

78.     Gotham, ZDG and Western are all insureds under the Allied Specialty policy.

79.     On September 25, 2019, by and through its attorneys, Western tendered the Complaint in the Gotham/ZDG Lawsuit to Allied Specialty.

80.     By letter dated December 13, 2019, Western's attorneys requested a response to the September 25, 2019 tender.

81.     On February 27, 2020, Western first became aware of correspondence, dated October 1, 2019, from attorneys representing Allied Specialty, purportedly sent by email and first-class mail to Western's attorneys.  (Neither Western nor its attorneys have record of receipt of this letter prior to February 27, 2020.)  According to the October 1, 2019 letter, Allied Specialty was still investigating under a reservation of rights.

82.     Allied Specialty's failure to pay the claim of two of its insureds, Gotham and ZDG, has resulted in those insureds filing the Gotham/ZDG Lawsuit against Western, also an Allied Specialty insured.

83.     Western is, and at all relevant times was, in compliance with all conditions precedent for coverage under the Allied Specialty Policy.

84.     Despite demands, Allied Specialty unreasonably refuses and/or otherwise fails to pay the Claims of Gotham and ZDG under the BR Policy, thereby causing those parties to file the Gotham/ZDG Lawsuit against Western.

85.     Allied Specialty's failure to pay the Claims of Gotham and ZDG and to respond to Western's tender for coverage under the policy is wrongful and unreasonable and in breach of its contractual obligations under the BR Policy.

86.     As a foreseeable consequence of Allied Specialty's refusal to provide coverage in breach of its contractual obligations under the BR Policy, Western has and will continue to suffer harm, all in a sum to be determined at the time of trial.

## COUNT IV

## DECLARATORY JUDGMENT AS TO ALLIED SPECIALTY POLICY

87.     Western hereby incorporates paragraphs 1 through 86 inclusive, as though fully set forth herein.

88.     A dispute has arisen between Western and Allied Specialty regarding whether Allied Specialty is obligated to pay the Claims of Gotham and ZDG, which claims those parties now assert against Western in the Gotham/ZDG Lawsuit.

89.     An actual case and a justiciable controversy exist regarding Allied Specialty's obligations under the Allied Specialty BR Policy with respect to whether Allied Specialty must pay for damages and other benefits due under the policy.

90.     A declaratory judgment pursuant to 28 U.S.C. § 2201 is necessary and appropriate to determine the rights and duties of Western and Allied Specialty pursuant to the Allied Specialty Policy.

## COUNT V

## BREACH OF CONTRACT AGAINST AWAC

91.     Western hereby incorporates paragraphs 1 through 90, inclusive, as though fully set forth herein.

92.     AWAC, in consideration of premiums paid by Western, duly executed and delivered to Western the AWAC Policy.

93.     Western acquired the AWAC Policy to insure against loss, including, among other things, damages because of a professional liability claim made by a third-party against Western.

94.     Western is, and at all relevant times was, in compliance with all conditions precedent for coverage under the AWAC Policy.

95.     AWAC is obligated pursuant to the terms of the AWAC Policy to pay for all sums in excess of the $250,000 Self Insured Retention that Western is legally obligated to pay as "professional damages" because of a "claim" resulting from an actual or alleged act, error or omission in "professional services."

96.     The Gotham/ZDG Lawsuit, first filed June 4, 2019, is a "claim" under the AWAC PL Policy made against Western within the October 1, 2018 – October 1, 2019 policy period.

97.     In the Complaint/"claim," Gotham and ZDG seek "professional damages" (an award of compensatory damages) arising out of Western's rendering of "professional services" ("construction/project management […] when part of a construction/project management and or a design build contract and in support of [Western's] Work").

98.     Western rendered such "professional services" after the professional liability retroactive date (October 1, 2015) and prior to the expiration of the policy period (October 1, 2019).

99.     Western timely reported the claim to AWAC on September 25, 2019 (during the policy period) seeking coverage under the AWAC Policy, including a defense of the Complaint/"claim."

100.    Since that time, AWAC has requested additional information from Western and Western had supplied such information during telephone calls with AWAC and via correspondence dated January 16, 2020 and February 19, 2020.

101.    On March 19, 2020, through counsel, AWAC denied that it has any obligation to defend or indemnify in connection with the allegations in the Western Gotham/ZDG Lawsuit.

102.    AWAC has a duty to defend Western in connection with the "claim" pursuant to the terms of the AWAC Policy.

103.    The allegations of the Complaint clearly allege a reasonable possibility for coverage for a "claim" for "professional damages" resulting from an actual or alleged act, error or omission in "professional services," thereby triggering AWAC's duty to defend.

104.    Despite demands, AWAC unreasonably refuses and/or otherwise fails to defend Western or to pay covered "claim expenses," under the AWAC Policy terms.

105.    AWAC's refusal and/or failure to pay coverage benefits due and owing to Western constitutes a breach of the AWAC Policy.

106.    As a result of AWAC's refusal and/or failure to defend Western, in breach of its contractual obligations, Western has suffered damages and will continue to suffer damages in the future, all in a sum to be determined at the time of trial.

## COUNT VI

## DECLARATORY JUDGMENT AS TO AWAC POLICY

107.    Western hereby incorporates paragraphs 1 through 106, inclusive, as though fully set forth herein.

108.    A dispute has arisen between Western and AWAC regarding whether AWAC is obligated to defend Western or otherwise pay claim expenses arising from the claim.

109.    An actual case and justiciable controversy exists regarding AWAC's obligations under the AWAC PL Policy with respect to whether AWAC has a duty to defend Western for the Gotham/ZDG Lawsuit.

110.    A declaratory judgment pursuant to 28 U.S.C. § 2201 is necessary and appropriate to determine the rights and duties of Western and AWAC pursuant to the AWAC Policy.

## PRAYER FOR RELIEF

WHEREFORE, Western prays for judgment and the following specific relief against the Defendants:

1.      As against Zurich, monetary damages and defense costs associated with the Gotham/ZDG Lawsuit;

2.      As against Zurich, pre-judgment and/or post-judgment interest as permitted by law;

3.      A declaration that Zurich is obligated to defend Western under the Zurich Policy terms.

4.      As against Allied Specialty, monetary damages associated with the Gotham/ZDG Lawsuit;

5.      As against Allied Specialty, pre-judgment and/or post-judgment interest as permitted by law;

6.      A declaration that Allied Specialty is obligated to pay the Claims of the Insureds  under the Allied Specialty Policy terms;

7.      As against AWAC, monetary damages and claim expenses associated with the Gotham/ZDG Lawsuit;

8.      As against AWAC, pre-judgment and/or post-judgment interest as permitted by law;

9.      A declaration that AWAC is obligated to defend to Western and pay claim expense under the AWAC Policy terms;

10.     Attorneys' fees;

11.     Such other legal and equitable relief that this Court deems just and proper.

## JURY DEMAND

WHEREFORE, Western Waterproofing Company, Inc. hereby demands a trial by jury for all claims herein for which a jury is permitted.

RESPECTFULLY SUBMITTED,

Dated: April 22,  2020          _/s/ Jeremiah M. Welch_____
Jeremiah M. Welch, Esq. (NY State Bar No. 5057385)
jmw@sdvlaw.com
Melanie A. McDonald, Esq. (CA State Bar No. 326253; *pro hac vice application pending*)
SAXE DOERNBERGER & VITA, P.C.
Two Better World Circle, Suite 200
Temecula, CA  92590
(951) 365-3145

Samantha M. Oliveira, Esq. (CT State Bar No.
439130)
smo@sdvlaw.com
SAXE DOERNBERGER & VITA
35 Nutmeg Drive, Suite 140
Trumbull, CT  06611
(203) 287-2100
(203) 287-8847 – Facsimile

Attorneys for Plaintiff